## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| DEZMEN DAESHON SMITH, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 19-CV-0187-GKF-CDL |
| | ) | |
| SCOTT CROW,[1] | ) | |
| | ) | |
| Respondent. | ) | |

## OPINION AND ORDER

Petitioner Dezmen Daeshon Smith, an Oklahoma prisoner appearing through counsel, is serving a life sentence following his conviction, in the District Court of Tulsa County, Case No. CF-2015-866, of first-degree murder. Smith petitions for a writ of habeas corpus under 28 U.S.C. § 2254. He claims he is in state custody under a constitutionally-flawed judgment because trial errors and prosecutorial misconduct deprived him of a fair trial and his trial and appellate attorneys did not provide adequate representation. Respondent Scott Crow urges the Court to deny the petition. Having considered Smith's petition (Dkt. 2) and brief in support of the petition (Dkt. 8), Crow's response in opposition to the petition (Dkt. 13), the record of state-court proceedings (Dkts. 14, 15),[2] and applicable law, the Court denies the petition.

---

[1] According to the Oklahoma Department of Corrections' website (okoffender.doc.ok.gov), Smith currently is incarcerated at the Lawton Correctional Facility (LCF), in Lawton, Oklahoma. Because the LCF is a privately-operated prison, the correct respondent is Scott Crow, Director of the Oklahoma Department of Corrections. Rule 2(a), *Rules Governing Section 2254 Cases in the United States District Courts*. The Court therefore substitutes Scott Crow in place of James Yates as party respondent. The Clerk of Court shall note this substitution on the record.

[2] For reasons stated in the discussion section, the Court denies Smith's request for an evidentiary hearing.

## BACKGROUND

Following a trial, a Tulsa County jury found Smith guilty of first-degree murder.  Dkt. 14-8, Tr. Trial vol. 4, 797 [195].[3]  The State presented evidence at trial establishing that Smith fatally shot Keith Liggins, a barber, in February 2015, when Smith engaged in a shootout with a member of a rival gang, Christopher Ruff, inside a Tulsa barbershop.  Dkt. 14-5, Tr. Trial vol. 1, 199-203, 218, 222-31; Dkt. 14-6, Tr. Trial vol. 2, 308-10 [51-53], 320-22 [63-65], 331 [74], 384-87 [127-30], 391-401 [134-44]; Dkt. 14-7, Tr. Trial vol. 3, 473-74 [21-22], 516 [64]; Dkt. 14-8, Tr. Trial vol. 4, 631 [29].[4]  The jury recommended life imprisonment, and the trial court sentenced Smith accordingly.  Dkt. 14-9, Tr. Sentencing Hr'g 2.  Represented by appellate counsel, Smith filed a direct appeal in the Oklahoma Court of Criminal Appeals (OCCA), raising nine claims. Dkt. 8-1, *Smith v. State*, Case No. F-2016-236 (Okla. Crim. App. 2017) (unpublished) (OCCA Op.) 2-3.  The OCCA denied all nine claims and affirmed Smith's conviction and sentence.  *Id.* at 3-12.  Represented by state postconviction counsel, Smith applied for postconviction relief in state district court, claiming he was denied his Sixth Amendment right to the effective assistance of appellate counsel.  Dkt. 8-2, *Smith v. State*, No. PC-2019-0034 (Okla. Crim. App. 2019) (unpublished) (OCCA Order) 1.  The state district court denied the application, and the OCCA affirmed the denial of postconviction relief.  *Id.* at 1-5.

---

[3]  When citing to transcripts of state court proceedings, the Court refers to the original page numbers followed by the corresponding CM/ECF header page numbers, in brackets, if the CM/ECF header pagination differs from the original pagination.  Citations to all other documents refer only to the CM/ECF header pagination.

[4]  In addition to the murder charge based on Liggins's death, the State charged Smith with three counts of assault and battery with a deadly weapon for non-fatal injuries sustained by Randy Pierce, Lawrence Harris, and Sheldon Williams, Jr.  Dkt. 14-10, Original Record (O.R.) vol. 1, 28-29.  The jury found Smith not guilty as to those three counts.  Dkt. 14-8, Tr. Trial vol. 4, 797-98 [195-96].

Represented by habeas counsel, Smith filed the instant petition, asserting seven claims he presented to the OCCA through his direct and postconviction appeals.  Dkt. 2, Pet. 5-10, 16; Dkt. 8, Pet'r's Br. 2-3.   Smith requests an evidentiary hearing to develop factual support for his ineffective-assistance-of-appellate-counsel claim.  Dkt. 8, Pet'r's Br. 39, 41.  Crow contends an evidentiary hearing is not warranted and urges the Court to deny the petition.  Dkt. 13, Resp. 6-7, 78.

## *DISCUSSION*

### I.    **Framework for federal habeas review**

A federal court may grant habeas relief to a person in custody under a state-court judgment only if that person shows that he or she is "in custody in violation of the Constitution, laws, or treaties of the United States."  28 U.S.C. § 2254(a).  The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") strictly limits a court's discretion to grant federal habeas relief.  As relevant in this case, a federal habeas court shall not grant relief as to any federal claims that were adjudicated on the merits in state court unless the petitioner first shows that the state court's adjudication of the claim resulted in a decision (1) "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1),[5] or (2) "that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).

---

[5] As used in § 2254(d)(1), the phrase "clearly established Federal law" means "the governing legal principle or principles" stated by "the holdings" of the Supreme Court's "decisions as of the time of the relevant state-court decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A state court's decision is contrary to Supreme Court precedent "if: (a) 'the state court applies a rule that contradicts the governing law set forth in Supreme Court cases'; or (b) 'the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from [that] precedent.'" *House v. Hatch*, 527 F.3d 1010, 1018 (10th Cir. 2008) (quoting *Maynard v. Boone*, 468 F.3d 665, 669 (10th Cir. 2006)).

When the state court "'identifies the correct governing legal principle' in existence at the time" of its decision, the only question under § 2254(d)(1) is "whether the decision 'unreasonably applies that principle to the facts of the prisoner's case.'" *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011) (quoting *Williams*, 529 U.S. at 413). To establish that the decision resulted from an objectively unreasonable application of the law, a petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

A petitioner may also challenge the reasonableness of the factual underpinnings of the state court's decision on a federal claim. "A state-court decision unreasonably determines the facts if the state court 'plainly misapprehend[ed] or misstate[d] the record in making [its] findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim.'" *Wood v. Carpenter*, 907 F.3d 1279, 1289 (10th Cir. 2018) (quoting *Byrd v. Workman*, 645 F.3d 1159, 1170-72 (10th Cir. 2011)). But "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Rather, under § 2254(d)(2), the reasonableness of a factual determination also is measured by *Richter*'s fairminded-disagreement standard. *Dunn v. Madison*, 138 S. Ct. 9, 12 (2017); *see also Mays v. Hines*, 141 S. Ct. 1145, 1149 (2021) (*per*

*curiam*) (reiterating that "if [*Richter*'s] rule means anything, it is that a federal court must carefully consider all the reasons and evidence supporting the state court's decision" and that the federal court may not disturb the state court's decision "without identifying—let alone rebutting—all of the justifications" that may support that decision).[6]

Congress made § 2254(d)'s standards demanding "to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions." *Id.* at 102-03. Thus, state prisoners may obtain federal habeas relief from a state conviction only in cases demonstrating "extreme malfunctions in the state criminal justice systems." *Richter*, 562 U.S. at 102.

If a petitioner overcomes § 2254(d)'s demanding standards, the federal court will review the petitioner's claims de novo to determine whether any alleged constitutional errors occurred and, if so, whether those errors were harmless. *Milton v. Miller*, 744 F.3d 660, 670-71 (10th Cir. 2014). On habeas review, the court evaluates harmlessness "under the 'substantial and injurious effect' standard set forth in *Brecht* [*v. Abrahamson*, 507 U.S. 619, 631 (1993)]." *Fry v. Pliler*, 551 U.S. 112, 121 (2007).

## II.   Analysis

Smith claims he was denied his Fifth, Sixth, and Fourteenth Amendment rights to due process and a fair trial because: (1) "the State, without cause or judicial permission, stationed uniformed gang-unit police officers in the courtroom" (claim one); (2) the trial court permitted the State to elicit improper opinion testimony from Corporal Nathan Schilling (claim two); (3) the trial

---

[6] When § 2254(d) applies, the federal habeas court's review is limited to the same record that was presented in state court. *Pinholster*, 563 U.S. at 185. In addition, a federal court must presume the correctness of the state court's factual findings unless the petitioner rebuts that presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

court gave a coercive *Allen*[7] instruction (claim three); and (4) the prosecutor committed several acts of reversible misconduct (claim four). Dkt. 8, Pet'r's Br. 18-32. Smith further claims he was denied his Sixth and Fourteenth Amendment rights to the effective assistance of trial counsel (claim five) and appellate counsel (claim six). *Id.* at 33-39. Finally, Smith claims the cumulative effect of all errors deprived him of his Fifth and Fourteenth Amendment rights to a fair trial (claim seven). *Id.* at 40-41.

### A.    Presence of uniformed gang unit officers in courtroom (claim one)

Smith first claims he was deprived of a fair trial because "the State, without cause or judicial permission, stationed uniformed, gang-unit police officers in the courtroom." Dkt. 8, Pet'r's Br. 18. Smith argues the officers' presence in the courtroom deprived him of an impartial jury because it created an "unacceptable risk" that the jury would decide the case based on the perception that Smith is "dangerous" rather than on the evidence presented at trial. *Id.* at 18-23.

### 1.    Additional facts

Just before Smith's case-in-chief, and outside the presence of the jury, defense counsel advised the trial court he anticipated presenting three witnesses, and left the courtroom to confirm those witnesses were waiting. Dkt. 14-8, Tr. Trial vol. 4, 679 [77]. When defense counsel returned to the courtroom, a deputy informed the trial court, outside the presence of the jury, that the deputy escorted Smith's mother out of the courthouse because "[s]he was upset and making comments in front of the jurors in the hallway." *Id.* at 679-80 [77-78]. The deputy explained he could not hear the comments, but he "knew they pertained to a conversation that [Smith's mother] had had with [defense counsel] before [Smith's mother] left the courtroom." *Id.* at 680. Defense counsel explained that Smith's mother got upset when he discussed certain evidence with her. *Id.* at 680-81

---

[7] *Allen v. United States*, 164 U.S. 492 (1896).

[78-79].  The trial court noted that Smith's mother "spoke out" in the courtroom the day before, and defense counsel stated he had cautioned Smith's mother that she could be removed from the courthouse "if she said anything again."  Dkt. 14-8, Tr. Trial vol. 4, 681 [79].  The trial court agreed with the prosecutor that it would be appropriate to question the jury about whether they heard any of the comments outside the courtroom.  *Id.* at 682 [80].

After all parties announced they were ready to proceed, the jury returned to the courtroom. Dkt. 14-8, Tr. Trial vol. 4, 689 [87].  The trial court advised the jury how the trial would proceed, then inquired about the "disturbance in the hall."  *Id.* at 690 [88].  In response, one juror said, "It appeared to me that a mother was upset about testimony."  *Id.* at 691 [89].  When asked by the trial court if that affected the juror's impartiality, the juror responded, "No, sir.  A mother has a right to those feelings."  *Id.*  The trial court asked if all other jurors agreed that they were not "affected by anything they heard or saw," and noted that no juror raised a hand.  *Id.*

Defense counsel called his first witness, then immediately requested a bench conference where the following colloquy occurred:

| [Defense counsel]: | I understand the State wanted to put on gang evidence.  I didn't like it.  The Court overruled my objection.  That's fine.  We have a distraught mother that's out in the hallway. |
|---|---|
| [Trial court]: | What's that? |
| [Defense counsel]: | I have a distraught mother out in the hallway where the deputies escorted her, and other than escorting her, I've heard of no further problems.  I think it's completely inappropriate.  I've got two fully uniformed Tulsa gang officers sitting in the back of the courtroom.  I want them excused. This is the province of the deputies.  They can have security here.  If they feel that they need somebody, they can call somebody.  Otherwise, I do not want that in front of the jury. |
| [Trial court]: | If you'll ask them to hang out outside in the hallway.  It is kind of – |

| | |
|---|---|
| [Prosecutor]: | Okay. |
| [Trial court]: | It is.  Sustained. |

Dkt. 14-8, Tr. Trial vol. 4, 692-93 [90-91].  The prosecutor then indicated he was advising the officers to stand in the hallway.  *Id.* at 91.  After the first defense witness, Irma Lacy, took the stand, a second bench conference occurred outside the hearing of the jury:

| | |
|---|---|
| [Defense counsel]: | I'm going to move for a mistrial.  I think there's already been enough gang evidence here.  The fact we have a distraught mother and then after the Court sustains my motion, we have a third officer, gang officer, walk in. |
| [Trial court]: | They're leaving. |
| [Defense counsel]: | They are leaving, but it wasn't until that show of force was presented here.  There's been no incident in this court involving any type of threat to anybody.  The metal detector's been set up.  None of the other participants have been disruptive. |
| [Trial court]: | You need to make a record as to why you called them here, because I think he's made an objection and there was a reason why he did this.  Go ahead. |
| [Prosecutor]: | Well, first and foremost, I mean it's an open proceeding.  Any cop from any division is entitled to come and watch any trial.  But I will state that I did call them.  I had some legitimate concerns today when it became apparent that we had lost our security.  The gallery has tripled in size than the way it's been through the course of these proceedings.  I recognize one of the individuals in the gallery to be -- |
| [Defense counsel]: | If you would lower your voice. |
| [Prosecutor]: | -- to be a member of the Hoover criminal street gang that I'm in the middle of prosecuting.  Specifically that individual, it has come to my knowledge that he has been implicated in a recent murder even though the case has not been filed.  And we've also had multiple disturbances today, at least it's become apparent to me, people coming and going. |
| | When I inquired from the Sheriff's Department where the breakdown in security was, they said -- they implied they don't have enough people. |

|  | Accordingly, I asked Sergeant Larkin if he had some guys available just to make sure that we didn't have any issues. In no means was it an effort to intimidate anybody. This is simply the clothes that they were already wearing because this is what they wear at work. |
|---|---|
| [Trial court]: | I need to make a record. I was informed by the deputies this morning that they had a shortage of deputies due to illnesses. So we do not have the normal security we've had throughout the trial. And there has been a rather large gathering of people, and they have -- some of them have come and gone -- you all don't see this, but I do. Some of them that have come and gone have looked over at your client, there's been nodding back and forth. We have a guy back there that basically has got the colors that were described by Detective Larkin as being the colors of a gang. The Court has concerns. Now, I did not call the gang unit, but I have been concerned that there's been a lack of security at the door that we've had up to today throughout the trial. |
| [Defense counsel]: | I find it completely inappropriate that the State prosecutor on their own decides to call in gang unit officers to come over here to help assist in this. If the Sheriff's Department needs help, it's up to them, they provide courthouse security. There's not been any outbursts except for the defendant's mother and that was during this last break. That's the only outburst there has been. |
|  | People have come and gone throughout the course of the trial, and if the Court wants to control the court by saying if you leave you don't get to come back in until the next break, it's your court, you do what you want. |
|  | It is completely inappropriate for the State prosecutor on their own -- they don't ask for uniformed officers to come over, they specifically ask for gang task force officers. |
| [Trial court]: | I understand. I follow you. |
| [Defense counsel]: | I'm requesting a mistrial. |
| [Trial court]: | Overruled. Exception. |
| [Prosecutor]: | And just to make one final record. As to the reason why I called the gang unit is because, as [defense counsel] and the Court knows, those are the officers that I work most closely with and those are the ones that I typically have the ability to -- that basically will respond quick simply because of the |

9

|  | professional relationship I maintain with those particular officers. |
|---|---|
| [Defense counsel]: | I find it odd that those particular officers happened to be stationed right next door or in close proximity for [the prosecutor] to make that call when there's a whole building full of other police officers who are fully capable of providing this security for whatever perceived reason it may be, that those three individual officers were staged that closely. |
| [Trial court]: | I understand, but I also want to make a record that I believe this jury is unaffected by them.  These [jurors] are elder gentlemen, most of them, there are some younger ones. They've been very attentive to both sides, to everyone's evidence and everyone's questions, and I believe that they're able to set this aside.  That's why I'm going to overrule your request for a mistrial. |

Dkt. 14-8, Tr. Trial vol. 4, 694-98 [92-96].  After this ruling, defense counsel questioned the first defense witness.  *Id.* at 96.

### 2.    The OCCA's decision

The OCCA rejected Smith's claim that he was denied a fair trial based on "the presence of extra security in the form of uniformed gang unit police officers in the courtroom."  Dkt. 8-1, OCCA Op. 4-5.  After summarizing the facts set forth above, the OCCA stated that it would review the trial court's ruling on the motion for mistrial under an abuse-of-discretion standard.  *Id.*  The OCCA found no abuse of discretion, reasoning (1) there were uniformed officers present in the courtroom throughout the trial, (2) there was no evidence that the "jury ascribed negative reasons for the brief presence of the uniformed gang unit officers instead of the sheriff's deputies who had been present throughout the proceedings for security, and (3) the jury acquitted Smith of three of the four counts and recommended the minimum sentence available as to the murder conviction. *Id.* at 5-6.  The OCCA ultimately concluded there was "no evidence of harm" and that the record thus did not show any abuse of discretion.  *Id.* at 6.

10

### 3.      Analysis and conclusion

Smith contends the OCCA's decision either is contrary to, or involves an unreasonable application of, *Holbrook v. Flynn*, 475 U.S. 560 (1986).  Dkt. 8, Pet'r's Br. 21-23.  Crow disagrees, arguing that the OCCA reasonably applied *Holbrook* to the facts of this case.  Dkt. 13, Resp. 21-24.[8]

In *Holbrook*, the Supreme Court spoke directly on the question of "whether the conspicuous, or at least noticeable, deployment of security personnel in a courtroom during trial is the sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial."  475 U.S. at 568-69.  And the *Holbrook* Court concluded the answer to that question is no.  475 U.S. at 569.  The Supreme Court stated,

> Central to the right to a fair trial, guaranteed by the Sixth and Fourteenth Amendments, is the principle that "one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial."  *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978).  This does not mean, however, that every practice tending to single out the accused from everyone else in the courtroom must be struck down. Recognizing that jurors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance, we have never tried, and could never hope, to eliminate from trial procedures every reminder that the State has chosen to marshal its resources against a defendant to punish him for allegedly criminal conduct.    To guarantee a defendant's due process rights under ordinary circumstances, our legal system has instead placed primary reliance on the adversary system and the presumption of innocence.    When defense counsel

---

[8]  Crow also argues that federal habeas relief is not warranted as to claim one because whether a trial court erred in denying a motion for mistrial is a matter of state law and, in any event, there is no clearly established federal law relative to claim one. Dkt. 13, Resp. 16-21.  The Court disagrees.  Under the particular facts of this case, Smith moved for a mistrial to cure the allegedly prejudicial effect of uniformed gang-unit officers in the courtroom.  Smith argued in the OCCA, and reasserts here, that the presence of these officers in the courtroom violated his federal constitutional rights to a fair and impartial trial, as those rights are interpreted in *Holbrook*. Dkt. 13-1, Appellant's Br. 26-32.  And, as discussed next, *Holbrook* clearly established a case-by-case approach to determining whether a criminal defendant's right to a fair trial is violated by the presence of uniformed officers in the courtroom.  Contrary to Crow's position, Smith sufficiently alleges a constitutional claim and identifies clearly established federal law relevant to that claim.

vigorously represents his client's interests and the trial judge assiduously works to impress jurors with the need to presume the defendant's innocence, we have trusted that a fair result can be obtained.

*Holbrook*, 475 U.S. at 567-68.  The *Holbrook* Court distinguished "the use of identifiable security officers from courtroom practices [the Supreme Court] might find inherently prejudicial" like permitting the jury to see a defendant shackled or wearing prison clothes during the trial.  *Id.* at 569.  The *Holbrook* Court reasoned:

> While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable.  Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence.  Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards.  If they are placed at some distance from the accused, security officers may well be perceived more as elements of an impressive drama than as reminders of the defendant's special status.  Our society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm.  *See Hardee v. Kuhlman*, 581 F.2d 330, 332 (CA2 1978).
>
> To be sure, it is possible that the sight of a security force within the courtroom might under certain conditions "create the impression in the minds of the jury that the defendant is dangerous or untrustworthy."  *Kennedy v. Cardwell*, 487 F.2d 101, 108 (CA6 1973), *cert. denied*, 416 U.S. 959, 94 S. Ct. 1976, 40 L. Ed. 2d 310 (1974).  However, "reason, principle, and common human experience," [*Estelle v. Williams*, 425 U.S. 501, 504, 96 S. Ct. 1691, 1693 (1976)], counsel against a presumption that any use of identifiable security guards in the courtroom is inherently prejudicial.  In view of the variety of ways in which such guards can be deployed, we believe that a case-by-case approach is more appropriate.

*Holbrook*, 475 U.S. at 567-69.

The *Holbrook* Court applied the case-by-case approach to facts very similar to those in the instant case.[9]   In *Holbrook*, the habeas petitioner's trial counsel complained at the beginning of petitioner's trial that petitioner and his co-defendants would be prejudiced by the presence of four uniformed state troopers seated in the first row of the courtroom's spectator section.   475 U.S. at 562-63.   The trial court noted that it had not requested the assistance of the state troopers, but explained that the state troopers were present because several courthouse security officers were unavailable.   *Id.* at 563.   At least three to four uniformed state troopers sat behind petitioner and his co-defendants throughout the two-month trial.   *Id.* at 565-66.   The *Holbrook* Court concluded the habeas petitioner in that case did not face an "unacceptable risk of prejudice in the spectacle

---

[9]   Smith cites three cases for support that involve dissimilar facts: *Gardner v. Galetka*, 568 F.3d 862 (10th Cir. 2009), *Woods v. Dugger*, 923 F.2d 1454 (11th Cir. 1991), and *Balfour v. State*, 598 So. 2d 731 (Miss. 1992).   In *Gardner*, the petitioner claimed multiple security measures, "including the presence of four security officers wearing bulletproof vests, electronic screening devices at the courtroom entrance, escorts for the jurors to get to their cars after dark, and, most importantly, visible shackles," deprived him of a fair trial.   568 U.S. at 890-91.   Applying *Holbrook*, the United States Court of Appeals for the Tenth Circuit found that only the visible shackles were inherently prejudicial and concluded that the complained of security measures were justified because the petitioner "not only had a history of violence, but was on trial for a murder committed while attempting to escape from a courthouse."   *Id.* at 891.   In *Woods*, the defendant was prosecuted in a small town for killing a correctional officer who worked for a corrections facility that served as one of the rural area's largest employers.   923 F.2d at 1457-59.   The United States Court of Appeals for the Eleventh Circuit concluded that the defendant in that case was prejudiced by the presence of 45 uniformed correctional officers in the courtroom throughout the trial, noting that the officers made up nearly half of all spectators, and by extensive pretrial publicity.   *Id.* at 1459-60.   In *Balfour*, the Supreme Court of Mississippi found several constitutional errors, reversed a capital murder conviction, and vacated a death sentence in a case involving the murder of a law enforcement officer.   598 So. 2d at 756-57.   In that case, the defendant alleged the trial court took no action to control the number of uniformed law enforcement officers who attended the trial.   *Id.* at 756.   The Supreme Court of Mississippi did not find reversible error on that point; rather, it noted "that in capital murder cases where the victim was a member of law enforcement, the *potential exists* for a coercive atmosphere when uniformed law officers sit together in a group" and thus "discourage[d] this practice."   *Id.* (emphasis in original).   These cases do not lend support to Smith's position that the brief presence of two to three uniformed gang-unit officers standing near the back of the courtroom prejudiced his trial and, in any event, these cases are not clearly established federal law for purposes of applying § 2254(d).

of four [uniformed] officers sitting in the first row of a courtroom's spectator section." *Holbrook*, 475 U.S. at 571.  The Supreme Court noted, "Four troopers are unlikely to have been taken as a sign of anything other than a normal official concern for the safety and order of the proceedings." *Id.*

In the instant case, two uniformed gang-unit officers stood in the back of the courtroom for a brief period before Smith's case-in-chief.  Defense counsel objected to their presence, arguing it would prejudice Smith, and the trial court sustained the objection and directed the prosecutor to ask the officers to leave.  As the two officers were leaving, a third uniformed gang-unit officer briefly joined the first two before all three left the courtroom.  On these facts, the OCCA concluded that Smith suffered "no harm," reasoning that there were other uniformed officers present in the courtroom throughout the trial, there was no evidence that the "jury ascribed negative reasons for the brief presence of the uniformed gang unit officers instead of the sheriff's deputies who had been present throughout the proceedings for security," and the jury acquitted Smith of three of charges and imposed the minimum sentence for the murder conviction.   Dkt. 8-1, OCCA Op. at 5-6.

Under the facts of this case, the Court agrees with Crow that the OCCA's decision is neither contrary to nor based on an unreasonable application of *Holbrook*.  As a result, § 2254(d) bars relief, and the Court denies the petition as to claim one.

## B.    Admission of improper opinion testimony (claim two)

Smith claims he was deprived of a fair trial because the trial court erroneously admitted improper opinion testimony of a law enforcement officer, Corporal Nathan Schilling.  Dkt. 8, Pet'r's Br. 24-25.  Crow contends the admission of improper testimony implicates a matter of state

law and, even assuming Smith states a federal due-process claim, Smith was not deprived of a fair trial.  Dkt. 13, Resp. 25-32.

### 1.      Additional facts

At trial, Chadrick Colbert, Smith's codefendant,[10] testified that after Chris Ruff threatened Colbert at the barbershop, Colbert and his friend Damoni Ousley, drove to Smith's house, about "[a] hundred yards probably" from the barbershop.  Dkt. 14-6, Tr. Trial vol. 2, 382-89 [125-32].  Smith was not home, so Colbert and Ousley waited outside for about five to ten minutes.  *Id.* at 389-90 [132-33].  When Smith arrived, Colbert told him that Ruff threatened him, and Smith appeared upset.  *Id.* at 390-91 [133-34].  Smith and Colbert then armed themselves with guns.  *Id.* at 391-92 [134-35].  Colbert had a .40 caliber pistol, and Smith had an assault rifle.  *Id.* at 392 [135].  Colbert testified that he did not discharge his pistol at the barbershop, that Ruff and Smith exchanged gunfire, and that Ruff had a pistol.  *Id.* at 393-95 [136-38].

Corporal Nathan Schilling, a homicide detective, testified at trial that law enforcement officers who executed a search warrant at Smith's house found empty ammunition boxes in an outdoor trash can, found one round of ammunition that was consistent with the 7.62 x 39 caliber cartridge casings found at the barbershop, and found a "large drum magazine that would go into the bottom of an AK-47" assault rifle that was loaded with the same caliber and brand of rifle ammunition found at the barbershop.  Dkt. 14-7, Tr. Trial vol. 3, 494 [42], 542-43 [90-91], 554-65 [102-13].  Officers also found two cell phones in Smith's bedroom and, later, extracted from

---

[10]  The State charged Colbert with the same four crimes as Smith.  Dkt. 14-10, O.R. vol. 1, 28-29.  Colbert waived his right to a jury trial, testified against Smith, and, after Smith's trial, pleaded guilty and was convicted of being an accessory after the fact (count one) and three counts of assault and battery with a dangerous weapon (counts two through four).  Dkt. 14-6, Tr. Trial vol.    2,    406-07    [149-50];    *see    also    State    v.    Colbert*, https://www.oscn.net/dockets/GetCaseInformation.aspx?db=tulsa&number=CF-2015-866&cmid=2812166, last visited Aug. 25, 2022.

one cell phone several photographs depicting images of: a Draco AK-47 assault rifle, with and without a drum magazine attached; "banana clip" magazines; two semiautomatic pistols, one of which had an extended magazine; and Smith pointing the AK-47 at the camera. Dkt. 14-7, Tr. Trial vol. 3, 566 [114], 576-86 [124-34].

After Corporal Schilling testified that the officers did not recover the AK-47 assault rifle depicted in the photographs during the search of Smith's home, the prosecutor asked Schilling whether it was "significant to [Schilling] that that weapon was missing even though [officers] found several other weapons in that particular house." Dkt. 14-7, Tr. Trial vol. 3, 586 [134]. Schilling responded, "Yes," and, when the prosecutor asked, "Why," defense counsel objected as to relevance, prompting a bench conference. *Id.* at 586-87 [134-35]. At the bench, the following colloquy occurred:

| [Prosecutor]: | Judge, I believe it's more likely that that particular Draco AK-47 is the murder weapon, and in light of the fact this house has all these different firearms, but that's the one that's missing. |
|---|---|
| [Trial court]: | Yeah. I think based on his training and experience, his investigation, he can give a lay opinion and rational perception of what he found during his investigation. |
| [Defense counsel]: | I understand, but I'm objecting. |
| [Trial court]: | Okay. It will be overruled. |

*Id.* at 587 [135]. The prosecutor restated his question regarding the significance of finding other guns in Smith's home and not finding the assault rifle, and Schilling testified:

Based on my experience, if a gun gets a body on it, if someone's killed with a gun, at that point it's kind of you've lost it. You're going to get rid of it because that can tie you back to the murder scene. So a high-dollar gun that's unique, that's interesting, that's fun to show off, you're not going to get rid of it unless there's a reason to, and in my opinion it would be because you killed somebody with it.

Dkt. 14-7, Tr. Trial vol. 3, 587-88 [135-36].   On cross-examination, defense counsel elicited testimony that Schilling had no specific evidence showing that Smith knew, before the search warrant was executed, that Liggins had died from a gunshot wound.  *Id.* at 588-92 [136-40].

### 2.      The OCCA's decision

On direct appeal, Smith argued that the trial court abused its discretion by permitting Schilling to testify that Smith "had gotten rid of a Draco rifle because it had gotten a body on it and somebody had been killed." Dkt. 13-1, Appellant's Br. 32-35.  Smith also argued that it was improper for Schilling to twice refer to the crime scene as a "murder scene."  *Id.* at 34.  Smith argued that Schilling's lay opinion testimony and his references to "murder" rested on "speculation, invaded the province of the jury, and improperly told the jury what result to reach in this case."  *Id.* at 35.  He further argued that Schilling's testimony "so infected [Smith's] trial with unfairness as to make the resulting conviction a denial of due process."  *Id.*  The OCCA disagreed. The OCCA noted that Smith did not object to Schilling's challenged testimony, reviewed this claim "for plain error only," and concluded, "Smith has not shown that the admission of the challenged testimony was error or that its admission affected his substantial rights."  Dkt. 8-1, OCCA Op. 6.

### 3.      Analysis and conclusion

As Crow argues, the admission of evidence generally is a matter of state law and does not present a cognizable claim for federal habeas review.  Dkt. 13, Resp. 26-28; *see Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (noting that the determination of whether evidence was properly admitted under state law "is no part of a federal court's habeas review of a state conviction"); *Moore v. Marr*, 254 F.3d 1235, 1246 (10th Cir. 2001) ("As a general matter, federal habeas relief does not lie to review state law questions about the admissibility of evidence.").  As a result, a federal

habeas court ordinarily must determine only whether, when "considered in light of the entire record, [the admission of the challenged evidence] resulted in a fundamentally unfair trial." *Knighton v. Mullin*, 293 F.3d 1165, 1171 (10th Cir. 2002); *see also Moore*, 254 F.3d at 1246 (noting that "federal courts may not interfere with state evidentiary rulings unless those rulings rendered 'the trial so fundamentally unfair as to constitute a denial of federal constitutional rights'" (quoting *Tucker v. Makowski*, 883 F.2d 877, 881 (10th Cir. 1989)).

In this proceeding, Smith focuses solely on the admission of Corporal Schilling's opinion that someone who has killed another person with a gun likely would get rid of that gun. Dkt. 8, Pet'r's Br. 24-25. Smith contends the OCCA's decision as to this claim is objectively unreasonable because (1) the OCCA misstated the facts when it treated his challenge to Schilling's lay opinion testimony as not preserved for appeal and thus erroneously applied plain-error review; and (2) the OCCA should have found that the admission of the challenged testimony was "fundamental error" because, in Smith's view, Corporal Schilling "told the jury that Smith got rid of a weapon because [Smith] had shot and killed someone with it," and thus told the jury to find Smith guilty. *Id.* at 24-25.

The Court agrees with Smith that the OCCA misstated a fact in the record when it determined that Smith did not object at trial to the admission of Corporal Schilling's lay opinion testimony. As just discussed, defense counsel objected when the prosecutor asked Schilling to explain why it was significant that law enforcement officers did not find a Draco AK-47 at Smith's house. Dkt. 14-7, Tr. Trial vol. 3, 586-87 [134-35]. The trial court overruled the objection because it found that Schilling could opine, based on his experience, whether someone who killed another person with a gun might get rid of the gun. *Id.* That said, as Crow contends, defense counsel objected on relevance grounds, whereas appellate counsel argued the testimony would invade the

18

province of the jury, so the OCCA properly applied plain-error review.  Dkt. 13, Resp. 29-30; *see*

*Postelle v. State*, 267 P.3d 114, 129 (Okla. Crim. App. 2011) (stating that "the appellate court will

not entertain a different objection on appeal and will review for plain error only").

But, for purposes of federal habeas review, the parties' debate over appellate preservation

issues is irrelevant.  The OCCA's application of the plain-error standard, even if erroneous, does

not alter the question before this Court:  whether it was objectively unreasonable for the OCCA to

conclude that the admission of Corporal Schilling's opinion did not deprive Smith of a fair trial.

By applying its plain-error standard, the OCCA effectively concluded that Smith was not deprived

of due process.  *See Thornburg v. Mullin*, 422 F. 3d 1113, 1125 (10th Cir. 2005) (finding "no

practical distinction between" the OCCA's plain-error test and the federal due-process test).

*Thornburg* instructs this Court to defer to the OCCA's decision regarding the alleged due-process

violation unless the OCCA unreasonably applied the federal due-process standard.  *Id.*  Having

read the trial transcripts in their entirety, this Court finds nothing objectively unreasonable about

the OCCA's decision that the admission of Corporal Schilling's lay opinion testimony did not

deprive Smith of a fair trial.

Before Corporal Schilling testified, the jury heard testimony that Colbert and Smith were

members or associates of the same gang, that Colbert saw Ruff—a member of a rival gang—in a

barbershop, perceived that Ruff threatened him, and responded to the perceived threat by leaving

the barbershop and enlisting Smith's assistance.  Dkt. 14-6, Tr. Trial vol. 2, 380-401 [123-44].

The jury also heard testimony that after Colbert and Smith armed themselves with a pistol and an

assault rifle, the two men returned to the barbershop where Smith exchanged gunfire with Ruff,

resulting in the death of Liggins and the injury of three other bystanders.  *Id.* at 274-92 [17-35],

303 [46], 380-401 [123-44].  In addition, the jury heard testimony about, and saw photographs

depicting, Smith displaying multiple weapons, including photographs of a Draco AK-47, like the one Ruff described as the weapon used by Smith during the shooting, and of Smith pointing the Draco AK-47 at the camera while taking a selfie.  Dkt. 14-5, Tr. Trial vol. 1, 225-27; Dkt. 14-7, Tr. Trial vol. 3, 566 [114], 576-86 [124-34]; Dkt. No. 14-8, Tr. Trial vol. 4, 651-53 [49-51]. Finally, the jury heard that Corporal Schilling was the second-in-command of the homicide unit and had extensive experience in homicide investigations.  Dkt. 14-7, Tr. Trial vol. 3, 542-43 [90-91].  At the close of all evidence the trial court instructed the jury that it could draw reasonable inferences from the testimony and exhibits presented at trial and that jurors could use their common sense to "make deductions and reach conclusions" based on facts established by the evidence.  Dkt. 14-11, O.R. vol. 2, 11.  On this record, it was objectively reasonable for the OCCA to conclude that the admission of Corporal Schilling's opinion testimony did not violate Smith's right to due process.  Even assuming that testimony had been excluded, as Smith contends it should have been, it would have been reasonable for the jury to infer or deduce from the evidence that Smith had a Draco AK-47 before the shooting, that he used a Draco AK-47 during the shooting that resulted in Liggins's death, and that he disposed of the Draco AK-47 after the shooting so that it would not connect him to the shooting.

Because the OCCA's rejection of Smith's due-process claim is objectively reasonable, § 2254(d) bars relief, and the Court therefore denies the petition as to claim two.

### C.    Incomplete and coercive *Allen* instruction (claim three)

Next, Smith claims the jury's verdict was tainted by an incomplete and coercive *Allen* instruction.  Dkt. 8, Pet'r's Br. 26-30.  Crow contends the OCCA did not unreasonably apply clearly established federal law when it rejected Smith's claim.  Dkt. 13, Resp. 32-41.

1.     **Additional facts**

Around 5:30 p.m., the trial court excused the jury for deliberations.  Dkt. 14-8, Tr. Trial

vol. 4, 793 [191]; Dkt. 14-11, O.R. vol. 2, 60.  Just over an hour later, at 6:49 p.m., the jury sent

the following question to the trial court: "What is the evidence for which bullets wounded Sheldon,

Lawrence, & Randy?"  Dkt. 14-10, O.R. vol. 1, 191.  The trial court responded by informing the

jury it had all the law and evidence necessary to reach proper verdicts.  *Id.*  Several hours later, at

10:47 p.m., the jury posed the following question: "Any suggestions?  We have 9 guilty and 4

undecided[.]  The four undecided feel there is not enough evidence to convict[.]"  Dkt. 14-10, O.R.

vol. 1, 192.  The written response to that question says, "Instruction # 53."  *Id.*  The trial transcript

further illuminates the trial court's response to the jury's second question.  The trial court called

the jury back into the courtroom and, with all parties present, stated:

> Gentlemen of the jury, this case has taken approximately 33 hours of trial
> time.  You have deliberated for approximately five-and-a-half hours.  And you
> report to me that you're experiencing difficulty in arriving at a verdict.  This is, as
> you know, an important case and a serious matter to all concerned.  You are the
> exclusive judges of the facts, the Court is the judge of the law.

> Now I must most respectfully and earnestly request of you that you return
> to your jury room and resume your deliberations.  Further open and frank discussion
> of the evidence and law submitted to you in this case may aid you in arriving at a
> verdict.  This does not mean that those favoring any particular position should
> surrender their honest convictions as to the weight or effect of any evidence solely
> because of the opinion of other jurors or because of the importance in arriving at a
> decision.

> No juror should ever agree to a verdict that is contrary to the law in the
> Court's instructions nor find a fact or concur in a verdict which in good conscience
> he or she believes to be untrue.  This does mean that you should give respectful
> consideration to each other's views and talk over any differences of opinion in the
> spirit of fairness and candor.  If at all possible you should resolve any differences
> and come to a common conclusion [so] that this case may be completed.  Each juror
> should respect the opinion of his or her fellow jurors as he or she should have them
> respect his or hers in an earnest or diligent effort to arrive at a just verdict under the
> law.

> So that will be Instruction No. 53, which I'll send back with you all.  I think
> that says everything.  That's what I expect of you all.  So I'll send you back now
> with the bailiff to continue your deliberations.  And I answered your question with
> Instruction 53.

Dkt. 14-8, Tr. Trial vol. 4, 794-95 [192-93].  Nothing in the record suggests that Smith objected to

the giving of this instruction or to the specific language of the instruction.  The jury resumed

deliberations and returned its verdicts at 12:30 a.m., finding Smith guilty as to first-degree murder

and not guilty as to three counts of assault and battery with a deadly weapon.  Dkt. 14-11, O.R.

vol. 2, 60.

## 2.     The OCCA's decision

On direct appeal, Smith argued that Instruction No. 53 resulted in a coerced verdict.  Dkt.

13-1, Appellant's Br. 44.  He argued the coercive effect of this instruction was exacerbated by the

fact that the trial court earlier told the jury that "[d]eliberations will take as long as you all decide

they take," and that no dinner would be provided to the jury.  *Id.* at 45.  Smith further argued that

Instruction No. 53 was incomplete because the trial court omitted the last two paragraphs of

Oklahoma Uniform Jury Instruction – Criminal (OUJI-CR) 10-11 which provide:

> You may be as leisurely in your deliberations as the case may require and
> take all the time necessary.  The giving of this instruction at this time in no way
> means that it is more important than any other instruction.  On the contrary, you
> should consider this instruction together with and as part of the instructions which
> I previously gave you.
>
> In stating the foregoing, I again repeat:  you are the judges of the facts; the
> court is the judge of the law.  In making all statements made to you I have not, nor
> do I now, express or intimate, nor indicate, in any way the conclusions to be reached
> by you in this case, nor do I intend in any way to coerce a verdict, nor directly nor
> indirectly force a verdict in this case.  I only ask that you return to your jury room
> and, again, diligently and earnestly under your oaths resume your deliberations.

Dkt. 13-1, Appellant's Br. 46-47 (emphases omitted).  Smith argued that the omission of this

language, the lateness of the hour when the instruction was given, and the possibility that the jury

returned a verdict of guilty on one count and not guilty on three counts because they were hungry and wanted to go home demonstrated that the jury's verdict was coerced. *Id.* at 47-48.

The OCCA reviewed Smith's challenge to the *Allen* instruction for plain error, noting that Smith did not object to the instruction. Dkt. 8-1, OCCA Op. 9. The OCCA rejected his claim, stating,

> The [trial] court's instruction was not coercive; nothing in its language tried to persuade the jury to reach a verdict by use of force or threats. The instruction asked jurors to engage in considerate deliberations in an effort to reach a verdict without surrendering honest convictions for the sake of reaching a verdict. [. . .] Nor is there any evidence the jury was so hungry and ready to leave that they disregarded their oaths and instructions. Rather, the record shows the jury continued to deliberate for over an hour and a half after receipt of the deadlocked jury instruction and reached its verdict both for and against Smith after thoughtful deliberation.

Dkt. 8-1, OCCA Op. 10 (internal citation omitted).

### 3.      Analysis and conclusion

The Supreme Court has long upheld the use of a supplemental jury instruction encouraging a deadlocked jury to continue deliberating in an attempt to reach a unanimous verdict. *Allen v. United States*, 164 U.S. 492 (1896). A proper *Allen* instruction "encourages unanimity (without infringement upon the conscientious views of each individual juror)" and urges jurors "to review and reconsider the evidence in the light of the views expressed by other jurors, in a manner evincing a conscientious search for truth rather than a dogged determination to have one's way in the outcome of the deliberative process." *Gilbert v. Mullin*, 302 F.3d 1166, 1173 (10th Cir. 2002) (quoting *United States v. Smith*, 857 F.3d 682, 683-84 (10th Cir. 1988)). On habeas review, federal courts must consider an allegedly "coercive" *Allen* instruction "in its context and under all the circumstances." *Lowenfield v. Phelps*, 484 U.S. 231, 237 (1988) (quoting *Jenkins v. United States*, 380 U.S. 445, 446 (1965)). Among the factors a court should consider are: (1) the specific language of the *Allen* charge; (2) whether the *Allen* charge was given alone or with other

instructions; (3) the timing of the instruction; and (4) the length of the jury's post-instruction deliberation. *Gilbert*, 302 F.3d at 1173-76 (citing *United States v. Arney*, 248 F.3d 984 (10th Cir. 2001)).

Here, as Smith contends, the trial court used a "modified" version of the pattern Oklahoma jury instruction, rather than the complete pattern instruction. *See* Instr. No. 10-11, OUJI Criminal (2d). But the language used is very similar to that in the "modified *Allen* charge" at issue in *Gilbert*, which is directed to all the jurors, rather than only those in the minority. 302 F.3d at 1174. In both cases, the trial court reminded the jury of its important role as the fact-finder and affirmed that no juror "should surrender [his or her] honest convictions . . . solely because of the opinion of other jurors or because of the importance in arriving at a decision." Dkt. 14-8, Tr. Trial vol. 4, 794 [192]; *Gilbert*, 302 F.3d at 1172. And both instructions encouraged the jurors to give "respectful consideration to each other's views and talk over any differences of opinion in the spirit of fairness and candor." Dkt. 14-8, Tr. Trial vol. 4, 795 [193]; *Gilbert*, 302 F.3d at 1172. Like the panel in *Gilbert*, the Court finds nothing in the language of this particular instruction "that could be deemed coercive." *Gilbert*, 302 F.3d at 1174. And, contrary to Smith's view, the omission of the last two paragraphs of the pattern instruction did not make the instruction impermissibly coercive. This factor weighs against coercion.

The *Allen* instruction in this case was not given at the same time as the other jury instructions. Rather, the trial court gave it in response to the jury's report that four jurors were undecided and leaning toward an acquittal. Although courts have found pre-deadlock instructions to be less coercive than those given during jury deliberations, there is no per se rule against a supplemental instruction. Numerous courts have found non-coercive *Allen* charges given after

notification of impasse.  *Gilbert*, 302 F.3d at 1174; *see also Arney*, 248 F.3d at 989 (collecting cases).  This factor weighs neutral.

Smith challenges the timing of the instruction, noting that the instruction was given at 11:00 p.m., after the jury had deliberated for over five hours, and contends the jurors were tired and hungry and had previously been told that the court would not provide them dinner. Dkt. 8, Pet'r's Br. 26.   While it is true that the trial court did not provide dinner to the jury, the trial court advised the jury before Smith presented his case-in-chief, that the trial would extend "later into the evening," that deliberations would "take as long as you all decide they take," and that jurors should plan accordingly by using a long break to "get bottles of water, snacks, box lunches, anything like that that [the jurors] might want to bring" with them in lieu of the court providing dinner for the jury. Dkt. 14-8, Tr. Trial vol. 4, 689-90 [87-88].  The trial court released the jury for a break at 2:15 p.m., directed the jurors to return by 3:50 p.m., and again advised them to use the long break to "get whatever you want to bring back with you." *Id.* at 750-51 [148-49].  Just before the jury was excused to the deliberation room, the trial court reminded jurors to leave their electronic devices on their chairs but to take with them "food, water, whatever you brought with you." *Id.* at 793 [191].  Like the OCCA, this Court finds no evidence in the record that hunger or weariness coerced the jury's verdict.  Moreover, as Crow contends, giving an *Allen* instruction at 11:00 p.m. is not necessarily coercive, particularly given that the jury did not begin deliberating until 5:30 p.m. and had been advised that deliberations could be lengthy. *See Gilbert*, 302 F.3d at 1175 (finding that timing of instruction given at 11:00 p.m. was not "of itself coercive" even though jurors in that case had expressed a preference for beginning deliberations the next day rather than later in the evening).  The timing factor weighs against coercion.

Finally, as the OCCA found, the jury deliberated for approximately an hour and a half after the trial court gave the *Allen* instruction. Dkt. 8-1, OCCA Op. 10. While courts have recognized that a jury returning a verdict shortly after receiving an *Allen* charge could weigh in favor of coercion, hour-long post-*Allen* deliberations have been repeatedly upheld. *See Gilbert*, 302 F.3d at 1175; *Arney*, 248 F.3d at 990. This factor weighs against coercion.

Looking at the totality of circumstances surrounding the *Allen* instruction given in this case, the Court finds the OCCA's determination that the *Allen* instruction was not coercive was neither "contrary to" or an "unreasonable application of" Supreme Court precedent. Accordingly, § 2254(d) bars relief, and the Court denies the petition as to claim three.

### D. Prosecutorial misconduct (claim four)

Smith next claims the cumulative effect of several instances of prosecutorial misconduct deprived him of a fair trial. Dkt. 8, Pet'r's Br. 31-33. Crow contends the OCCA's decision on this claim was neither contrary to nor based on an unreasonable application of clearly established federal law and was not based on an unreasonable determination of the facts. Dkt. 13, Resp. 41-51.

#### 1. Alleged misconduct

Smith first challenges remarks the prosecutor made during the examination of two witnesses. During the prosecutor's direct examination of Corporal Schilling, the prosecutor said, "And does [Exhibit] 172, does the drum in that particular picture appear to comport with previously admitted State's Exhibit, oh gosh, 152?" Dkt. 14-7, Tr. Trial vol. 3, 583 [131]. Smith argues this comment "was sarcastic and unprofessional. Dkt. 8, Pet'r's Br. 32.

Smith also contends the prosecutor "attempted to deceive [defense] witness Irma Lacy." *Id.* at 31. Highly summarized, Lacy testified that on the night of the shooting she was visiting

Smith's grandmother, Lorietta Smith,[11] at the home Lorietta shared with Smith, and that she was present in the home when law enforcement officers searched Smith's home.  Dkt. 14-8, Tr. Trial vol. 4, 699-725 [97-123].  A large part of Lacy's testimony, particularly on cross-examination, expressed frustration that neither the State nor defense counsel had contacted her earlier to obtain a witness statement and, more generally, expressed frustration with the criminal justice system. *Id.* For example, at one point, during cross-examination, the prosecutor asked Lacy if Lacy understood the allegations against Smith, and Lacy responded, "Yes."  *Id.* at 706 [105].  The prosecutor then said, "Okay," and Lacy stated, "I'm just curious to why a whole year you all never called me, and I was sitting there the whole time.  When it was fresh, no one called me.  Two policemen came in, they did come in and check the house twice."  Dkt. 14-8, Tr. Trial vol. 4, 707-08 [105-06].  After the prosecutor again said, "Okay," Lacy continued, stating, "[Lorietta] didn't want them to.  And I said, no, don't make them feel like you're hiding anything.  Let them come on in."  *Id.* at 708 [106].  Later, during recross-examination, the following colloquy occurred:

| | |
|---|---|
| [Prosecutor]: | Earlier, the first time I was talking to you just a minute ago, you said that [Lorietta] told you to let them do the search.  Just now you said it was your idea? |
| [Lacy]: | No, I didn't.  If that's what you heard, you're misunderstanding. |
| [Prosecutor]: | Okay. |
| [Lacy]: | I convinced her to let them do the search. |
| [Prosecutor]: | Why, though, because it was just a few moments ago you were telling us you can't trust the police? |
| [Lacy]: | It doesn't matter.  As a black person in America, whatever they ask you to do, you need to try and comply.  That's how I feel.  And that's what I teach my son. |
| [Prosecutor]: | You don't think the same standard applies to every color? |

---

[11]  In some parts of the trial transcript, Lorietta is mistakenly referred to as Loretta.

27

[Lacy]:           Oh, it don't, it don't.

      [Defense counsel]:    Objection.  This is beyond the scope.

      [Lacy]:               It don't.

      [Trial court]:         Sustained.

Dkt. 14-8, Tr. Trial vol. 4, 722-23 [120-21].   Smith argues that the prosecutor committed misconduct at the beginning of this colloquy because "the prosecutor mis-characterized [Lacy's] testimony, implying that Lacy was instructed to allow the search, and she had to correct him.  Dkt. 8, Pet'r's Br. 32-33.

Smith also complains of several remarks the prosecutor made during closing arguments. Smith contends the prosecutor "invoked societal alarm" during the initial closing argument by stating:

> Why are we here?  Because this is a big deal, because murder one is a big deal. Ever since society sprung forth, the biggest and greatest offense, the deliberate, unlawful taking of another life by a member of our community.  That's a big deal. That's why we are here this week.

Dkt. 8, Pet'r's Br. 32 (quoting Dkt. 14-8, Tr. Trial vol. 4, 758 [156].

Smith further contends the prosecutor "used unprofessional tactics and improper courtroom behavior" during the final closing argument:

1. by stating, at the beginning of his argument, "Woo, holy cow.  Members of the jury, welcome to the biggest frame job Tulsa County has ever seen," and, later, by referring again to the "world's greatest frame job."  Dkt. 8, Pet'r's Br. 31 (quoting Dkt. 14-8, Tr. Trial vol. 4, 778 [176], 789 [187]);

2. by belittling the defense and raising subtle racial overtones by noting that Smith did not have to present a defense and stating, "But they did put on a defense and you saw it, the

defense of [Smith's] black, you all picking on him.  Really?  That's it?"  Dkt. 8, Pet'r's Br. 31-32 (quoting Dkt. 14-8, Tr. Trial vol. 4, 791 [189]); and

3.   by equating "justice" with a verdict of guilty when he discussed using a material witness warrant to secure testimony from one state witness and said, "Keith Liggins deserves justice.  Are we [the State] supposed to be ashamed?  Absolutely not."  Dkt. 8, Pet'r's Br. 32 (quoting Dkt. 14-8, Tr. Trial vol. 4, 786 [184]).

Finally, Smith contends the prosecutor invaded the province of the jury, throughout the trial, by repeatedly referring to the shooting that resulted in Liggins's death as "murder" rather than "homicide."  Dkt. 8, Pet'r's Br. 33.

Smith argues, as he did on direct appeal, that the cumulative effect of the prosecutor's misconduct deprived him of a fair trial, particularly in light of the fact that the jury was deadlocked during deliberations and the trial court gave an improperly coercive *Allen* instruction.  Dkt. 8, Pet'r's Br. 33.

### 2.   The OCCA's decision

On direct appeal, the OCCA noted that Smith did not object to any of the allegedly improper and prejudicial remarks made by the prosecutor and thus reviewed his prosecutorial-misconduct claim under its plain-error standard.  Dkt. 8-1, OCCA Op. 10.  The OCCA concluded that Smith failed to establish "error, plain or otherwise," reasoning:

> When the challenged actions of the prosecutor are read and viewed in context, considering the corresponding arguments of defense counsel and the strength of the evidence, there is nothing in any of the challenged actions, individually, or cumulatively, that deprived Smith of a fair trial.

*Id.* at 10-11.

### 3.    Analysis and conclusion

As Crow contends, Smith does not argue the OCCA's decision on this claim either is contrary to clearly established federal law, involves an unreasonable application of clearly established federal law, or is based on an unreasonable determination of the facts.  Dkt. 13, Resp. 51.  Instead, he identifies the clearly established federal law governing his claim, asserts that he "apprized the OCCA of several instances of prosecutorial misconduct, and argues that equating a guilty verdict with justice is reversible error under state law.  Dkt. 8, Pet'r's Br. 31-33.

In some cases, a prosecutor's remarks or actions may "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (alteration added) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  A reviewing court evaluating a claim that the prosecutor's conduct deprived a defendant of due process must consider the alleged misconduct in the context of the "entire proceedings, including the strength of the evidence against the defendant." *Hanson v. Sherrod*, 797 F.3d 810, 843 (10th Cir. 2015).  Because the due-process "standard is a very general one," *Parker v. Matthews*, 567 U.S. 37, 48 (2012), reviewing courts have "more leeway . . . in reaching outcomes in case-by-case determinations," *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).  Federal habeas courts necessarily must consider that "leeway" in determining whether a state court has unreasonably applied the due-process standard in adjudicating a prosecutorial-misconduct claim.  *Parker*, 567 U.S. at 48-49.

Like the OCCA, this Court has considered the prosecutor's allegedly improper remarks in the context of the record as a whole and the strength of the evidence against Smith.  Having done so, the Court finds nothing objectively unreasonable about the OCCA's determination that many of the challenged remarks during the final closing argument were responsive to defense counsel's

closing remarks.  *See Darden*, 477 U.S. at 182 (discussing the "invited response" doctrine and explaining that the doctrine "is used not to excuse improper comments, but to determine their effect on the trial as a whole").  And the prosecutor's allegedly improper "oh, gosh," comment when referring to an exhibit, in context, appears to be filler for a memory lapse regarding an exhibit number, not unnecessary sarcasm.  That said, the Court agrees with Smith that several of the prosecutor's statements during the final closing argument appear, even from the cold transcript, unnecessarily sarcastic.  In addition, it may have been unnecessary for the prosecutor to characterize Smith's theory of defense by referring to Lacy's largely non-responsive testimony about her personal opinions of the criminal justice system.  But the Constitution does not establish a code of professional conduct for attorneys, even those who speak on behalf of the State.  Rather, the Constitution guarantees due process.  And, to establish a due-process violation, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned."  *Darden*, 477 U.S. at 181 (quoting *Darden v. Wainwright*, 699 F.2d 1031, 1036 (11th Cir. 1983)).  Moreover, even if fairminded jurists might disagree about the propriety of some of the prosecutor's challenged remarks, those same jurists would not disagree that the OCCA's ultimate decision is consistent with, and rests on a reasonable application of, clearly established federal law.  Section 2254(d) therefore bars relief, and the Court denies the petition as to claim four.

### E.  Ineffective assistance of trial counsel (claim five)

Smith claims trial counsel performed deficiently and prejudicially, thus depriving him of his Sixth Amendment right to the effective assistance of counsel, as interpreted in *Strickland v. Washington*, 466 U.S. 668 (1984).  Dkt. 8, Pet'r's Br. 34-35.  Smith faults trial counsel for: (1) failing to object to the imposition of post-imprisonment supervision; (2) failing to object to repeated references to "murder" made by the prosecutor and Corporal Schilling, (3) failing to

object to the admission of cumulative and repetitive photos and exhibits, (4) failing to object to prosecutorial misconduct, (5) failing to request proper jury instructions directing the jury how to consider other-crimes evidence and gang evidence, and (6) failing to object to the coercive and incomplete *Allen* instruction. *Id.* at 34-35. Crow contends the OCCA's decision as to this claim is neither contrary to nor based on an unreasonable application of *Strickland* and is not based on an unreasonable determination of the facts. Dkt. 13, Resp. 51-62.

### 1.     The OCCA's decision

Smith raised a nearly identical ineffective-assistance-of-trial-counsel claim on direct appeal, and the OCCA rejected it. Applying *Strickland*, the OCCA stated,

> We also reject Smith's claim that he was deprived of effective assistance of counsel based on defense counsel's failure to object to the imposition of post-imprisonment supervision (Prop. 1), object to Officer Schilling's references to the "murder scene" and the prosecutor's use of the word "murder" (Props. 3 & 7), object to the cumulative photographs (Prop. 4), object to the alleged prosecutorial misconduct (Prop. 7), object to the tactics of the district court once the jury announced it was deadlocked (Prop. 6), failing to request proper jury instructions (Prop. 5) and failing to use peremptory challenges to remove two jurors whom he claims were biased against him and predisposed toward the prosecution. Smith has not shown there is a reasonable probability that the outcome of his trial would have been any different had defense counsel done so.

Dkt. 8-1, OCCA Op. at 11.

### 2.     Analysis and conclusion

Smith contends the OCCA's decision that he failed to establish prejudice "is unreasonable in light of the law and the facts." Dkt. 8, Pet'r's Br. 35. But his sole argument on this point is that trial counsel's "mishandling of the late-night *Allen* instruction alone shows prejudice under *Strickland*." *Id.*

The Sixth Amendment guarantees criminal defendants the right to the effective assistance of counsel. U.S. Const. amend. VI; *Strickland v. Washington*, 466 U.S. 668, 686 (1984). Under *Strickland*, a defendant alleging ineffective assistance of counsel must show deficient performance

and resulting prejudice.  466 U.S. at 692.  The *Strickland* standard is "highly deferential" because a reviewing "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  Significantly, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."  *Id.* at 691.  Thus, "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution."  *Id.* at 692.  To establish prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.

On federal habeas review, a court must apply added deference when reviewing a state court's decision on a *Strickland* claim.  *See Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020) (stating, "We have recognized the special importance of the AEDPA framework in cases involving *Strickland* claims," and concluding that the "the Court of Appeals erred in ordering issuance of a writ of habeas corpus despite ample room for reasonable disagreement about the prisoner's ineffective-assistance-of-counsel claim" and "[i]n doing so . . . clearly violated [the Supreme] Court's AEDPA jurisprudence"); *Richter*, 562 U.S. at 105 ("The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." (internal citations omitted)).

As previously stated, Smith appears to argue that it was unreasonable for the OCCA to determine that counsel's failure to object to the *Allen* instruction, discussed here in claim three, did not result in prejudice.  But the Court fails to see how.  The OCCA considered and rejected Smith's claim, raised there as proposition six, that the *Allen* instruction was coercive.  Dkt. 8-1,

OCCA Op. 9-10.  Thus, it was reasonable for the OCCA to refer back to its prior discussion of that claim and find that defense counsel did not perform deficiently or prejudicially by failing to object to the *Allen* instruction.  *See Sperry v. McKune*, 445 F.3d 1268, 1275 (10th Cir. 2006) (explaining that trial counsel was not ineffective for failing to raise a meritless argument); *Hale v. Gibson*, 227 F.3d 1298, 1321-22 (10th Cir. 2000) (finding a petitioner could not show *Strickland* prejudice based on counsel's failure to object to the admission of evidence when admission was proper and any objection would have been overruled).  This same reasoning applies to each of trial counsel's alleged deficiencies, as the OCCA considered the underlying substantive claims and rejected each on the merits before determining trial counsel was not ineffective for failing to raise objections to meritless claims or request instructions that were not erroneously omitted.  Dkt. 8-1, OCCA Op., 2-11.

Viewing this claim with the double deference required by the AEDPA and *Strickland*, this Court cannot say that the OCCA's rejection of the Sixth Amendment claim is objectively unreasonable.  Section 2254(d) therefore bars relief, and the Court denies the petition as to claim five.

### F.    Ineffective assistance of appellate counsel (claim six)

Next, Smith claims appellate counsel performed deficiently and prejudicially, thus depriving him of his Sixth Amendment right to the effective assistance of counsel, as interpreted in *Strickland*.  Dkt. 8, Pet'r's Br. 36-39.  He specifically contends "that appellate counsel failed to investigate extra-record facts" and claim trial counsel was ineffective on grounds other than those raised in claim five.  *Id.* at 37.  Crow contends this claim is procedurally barred.  Dkt. 13, Resp. 63-64.  Alternatively, Crow contends that if the OCCA adjudicated this claim on the merits, the OCCA reasonably applied *Strickland* and reasonably determined the facts when it denied relief as

to this claim.  Dkt. 13, Resp. 64-76.  Finally, Crow contends that even if the Court reviews this claim de novo, Smith cannot establish a constitutional error.

### 1.    The OCCA's decision

In his application for postconviction relief, Smith argued, as he does in this proceeding, that appellate counsel performed deficiently and prejudicially by failing to argue that trial counsel provided ineffective assistance by "failing to marshal evidence related to:"  (1) three potential witnesses from Smith's workplace, one of whom signed Smith's timesheet (Deonta Gaines) and two of whom "would testify as to the time that he left work which is incompatible with the time of the murders" (Randall and John); (2) Smith's work uniform which he contends was a different color than the clothing worn by the shooter; (3) the jury's inconsistent verdicts; (4) two witnesses (Marlon Bruner and DeJuan Patrick) who saw the shooting and knew Smith but did not identify Smith as the shooter; and (5) "police reports in discovery [that] indicate time frames of the video of a car that are inconsistent with the State's theory of guilt."  Dkt. 8, Pet'r's Br. 37-38; Dkt. 13-3, Appl. 4.  In response to a question on his application as to how he could prove the facts alleged in support of his claim, Smith requested 60 days to investigate these claims and file supplemental factual support and a supporting Brief in support of [his] application."  Dkt. 13-3, Appl. 5.  Smith filed the application for postconviction relief on September 6, 2018.  *Id.* at 1.  The State filed a response on November 13, 2018, and the state district court denied the application three days later. Dkts. 13-4, 13-5.  The state district court did not mention Smith's request to supplement the record, but did note that the issue raised in the application could "be decided solely on the pleadings and records reviewed."  Dkt. 13-5, Dist. Ct. Order 1.

It appears the OCCA may have rejected this claim for two reasons.  First, the OCCA seemed to agree with the state district court that Smith's ineffective-assistance-of-*appellate-*

counsel claim was barred by the doctrine of *res judicata* because Smith raised an ineffective-assistance-of-*trial*-counsel claim on direct appeal and the OCCA rejected it.  Dkt. 8-2, OCCA Order 2.  Second, the OCCA acknowledged that Smith's first opportunity to raise an ineffective-assistance-of-appellate-counsel claim would be through his application for postconviction relief.  *Id.* at 2-3.  The OCCA also noted that a claim that appellate counsel was ineffective is subject to review under *Strickland* and that a reviewing court "must look to the merits of the issues that appellate counsel failed to raise" to evaluate appellate counsel's allegedly deficient and prejudicial performance.  *Id.* at 4.  The OCCA then stated,

> In the present case, [the state district court] found a claim raised and denied on direct appeal is not grounds for reasserting the claim under the guise of ineffective assistance of counsel and that the doctrine of *res judicata* does not allow the subdividing of an issue as a vehicle to relitigate it at a different stage of the appellate process.  *Hain v. State*, 1998 OK CR 27, ¶ 9, 962 P.2d 649, 653.  We agree. Petitioner has not shown that counsel's performance was either deficient or resulted in prejudice.  Further, the record does not support Petitioner's contention the District Court erred in denying his post-conviction application without an evidentiary hearing.  An evidentiary hearing is only required when there exists a genuine issue of material fact.

Dkt. 8-2, OCCA Order, 4.

### 2.      Standard of review

Initially, the Court finds it unclear whether claim six is subject to review under § 2254(d).  Smith contends the OCCA unreasonably applied federal law under § 2254(d), failed to consider the merits of his claim, and improperly found his claim barred by *res judicata*.  Dkt. 8, Pet'r's Br. 38-39.  In addition, Smith alleges he was diligent in trying to submit evidence in state court, that both the state district court and the OCCA denied his requests for an evidentiary hearing, and that he is thus entitled to an evidentiary hearing under 28 U.S.C. § 2254(e)(2) if the Court finds that he satisfies § 2254(d)'s standards as to this claim.  *Id.* at 38-39.  Crow briefly suggests that the OCCA's decision should be given deference, and urges the Court to find the OCCA reasonably

applied *Strickland*, but also argues the claim fails on de novo review and that no evidentiary hearing is warranted.  Dkt. 13, Resp. 64-76.

A fair reading of the OCCA's decision shows that the OCCA primarily relied on *res judicata* to reject the ineffective-assistance-of-appellate-counsel claim because the OCCA construed that claim as improperly attempting to relitigate the ineffective-assistance-of-trial-counsel claim Smith presented on direct appeal.  But it is clear from Smith's appellate brief that he did not allege in his postconviction appeal that trial counsel was ineffective for the same reasons as he did on direct appeal.  Dkts. 13-1, 13-3.  And, on postconviction appeal, he argued that appellate counsel was ineffective for not adequately investigating and presenting all allegations that would show trial counsel was ineffective.  Under these facts, it is not clear that *res judicata* barred relief.  And even if the OCCA's decision could be more reasonably read as adjudicating the merits of claim six, the OCCA unreasonably applied clearly established federal law to the facts of this case because it did not "look to the merits" of the claim Smith alleged appellate counsel erroneously omitted—namely, the claim that trial counsel failed to adequately investigate and present available evidence and call certain witnesses.  *Cargle v. Mullin*, 317 F.3d 1196, 1205 (10th Cir. 2003) ("The very focus of a *Strickland* inquiry regarding performance of appellate counsel is upon the merits of omitted issues, and no test that ignores the merits of the omitted claim in conducting its ineffective assistance of appellate counsel analysis comports with federal law.").

Under these circumstances, the Court finds it appropriate to review claim six de novo.  *See Cuesta-Rodriguez v. Carpenter*, 916 F.3d 885, 898 (10th Cir. 2019) (noting that de novo review applies to claims that a state court did not adjudicate on the merits).  Even assuming the OCCA properly applied *res judicata*, that too would not preclude de novo review because the claim the OCCA previously adjudicated is the claim raised here in claim five, not claim six.  *See Cone v.*

*Bell*, 556 U.S. 449, 466 (2009) ("When a state court declines to review the merits of a petitioner's claim on the ground that it has done so already, it creates no bar to federal habeas review.").  Before evaluating claim six, however, the Court must consider Smith's request for an evidentiary hearing.

### 3.     Evidentiary hearing

As previously noted, Smith contends he diligently sought an evidentiary hearing in state court to develop factual support for his claim that appellate counsel was ineffective for failing to argue that trial counsel failed to investigate and present available evidence and call certain witnesses.  Dkt. 8, Pet'r's Br. 38.  He now contends that it would be appropriate for this Court to hold an evidentiary hearing.  *Id.* at 38-39.

The AEDPA and Supreme Court precedent impose "stringent" requirements that must be met before a federal habeas court can exercise its discretion to hold an evidentiary hearing.  28 U.S.C. § 2254(e)(2); *Shinn v. Ramirez*, 142 S. Ct. 1718, 1728, 1734 (2022); *Pinholster*, 563 U.S. at 181.  First, as to those claims that were adjudicated on the merits in state court, federal habeas review is limited to the existing state-court record unless and until the petitioner satisfies § 2254(d)'s preconditions to relief.  *Pinholster*, 563 U.S. at 181; *Simpson v. Carpenter*, 912 F.3d 542, 575 (10th Cir. 2018).  As just discussed, under either reading of the OCCA's decision, § 2254(d) does not apply here.  Thus, *Pinholster*'s rule does not bar an evidentiary hearing.

Second, as to those claims that were not adjudicated on the merits in state court, a federal habeas court must consider whether the state prisoner failed to develop the state-court record.

> Section 2254(e)(2) provides that, if a prisoner "has failed to develop the factual basis of a claim in State court proceedings," a federal court may hold "an evidentiary hearing on the claim" in only two limited scenarios.  Either the claim must rely on (1) a "new" and "previously unavailable" "rule of constitutional law" made retroactively applicable by [the Supreme Court], or (2) "a factual predicate that could not have been previously discovered through the exercise of due diligence."  §§ 2254(e)(2)(A)(i), (ii).  If a prisoner can satisfy either of these exceptions, he also must show that further factfinding would demonstrate, "by clear

and convincing evidence," that "no reasonable factfinder" would have convicted him of the crime charged. § 2254(e)(2)(B).

*Ramirez*, 142 S. Ct. at 1734.  The *Ramirez* Court acknowledged that "§ 2254(e)(2) applies only when a prisoner "has failed to develop the factual basis of a claim" and explained that a state prisoner fails to develop the factual basis of a claim when the prisoner is "at fault" for the undeveloped state court record.  *Id.*  The *Ramirez* Court further explained that "under AEDPA and [the Supreme Court's] precedents, state postconviction counsel's ineffective assistance in developing the state-court record is attributed to the prisoner."  *Id.*  The *Ramirez* Court thus held that "under § 2254(e)(2), a federal court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel."  *Id.*  In other words, a state prisoner is "at fault" if state postconviction counsel failed to develop the state-court record and that prisoner must make the showings required by § 2254(e)(2) before he or she can obtain an evidentiary hearing.

Third, in those cases when neither § 2254(d) nor § 2254(e)(2) preclude an evidentiary hearing—i.e., when the state court did not adjudicate the merits of a claim, that claim is properly before the federal habeas court for de novo review, and the petitioner is not at fault for failing to develop the factual record in state court as to that claim—a state prisoner still must make the showings required by pre-AEDPA precedent to obtain an evidentiary hearing.  *Simpson*, 912 F.3d at 576.  In this circuit, that means a state prisoner who diligently attempted to develop the state-court record may obtain an evidentiary hearing "if (1) the facts were not adequately developed in state court, so long as that failure was not attributable to the petitioner, and (2) his allegations, if

true and not contravened by the existing factual record, would entitle him to habeas relief." *Id.* (quoting *Barkell v. Crouse*, 468 F.3d 684, 696 (10th Cir. 2006)).[12]

Here, contrary to Smith's assertion, his efforts to develop the state-court record were not diligent.  "Diligence, at a minimum, requires that an applicant both seek 'an evidentiary hearing in state court in the manner prescribed by state law,' and develop the record by submitting 'evidence that would be readily available if the claim were true.'" *Cannon v. Trammell*, 796 F.3d 1256, 1262 (10th Cir. 2015) (citation omitted).  As previously stated, when Smith, through state postconviction counsel, filed his application for postconviction relief, he alleged appellate counsel should have argued on direct appeal that trial counsel provided ineffective assistance regarding six "factual situations."  Dkt. 13-3, Appl. 4.  In the application, filed September 6, 2018, Smith requested 60 days "to investigate" his claim and "file supplemental factual support."  Dkt. 13-3, Appl. 1, 5.  The state district court denied the application more than 60 days later, but there is nothing in the record suggesting that Smith either investigated his claims or filed any supplemental factual support before the state district court entered its order.  In the petition-in-error Smith filed in the OCCA, on January 15, 2019, to support his postconviction appeal, Smith asked the OCCA to reverse the state district court's order "with directions to grant post-conviction relief and an evidentiary hearing as requested by Petitioner."  Dkt. 13-6, PC Pet. 1-2.  The brief Smith filed in the OCCA, on February 15, 2019, to support his postconviction appeal, again listed the "factual

---

[12] *Simpson* suggests that if a state prisoner satisfies the pre-AEDPA standards, the prisoner "is entitled to an evidentiary hearing."  912 F.3d at 576.  But the Supreme Court made clear in *Ramirez* that a state prisoner is never "entitled" either to an evidentiary hearing or federal habeas relief.  The *Ramirez* Court stated that even if a state prisoner makes whichever showings are necessary to establish that an evidentiary hearing is not barred by the AEDPA or Supreme Court precedent, "a federal habeas court still is not *required* to hold a hearing or take any evidence.  Like the decision to grant habeas relief itself, the decision to permit new evidence must be informed by principles of comity and finality that govern every federal habeas case."  142 S. Ct. at 1734.

scenarios" to support his ineffective-assistance-of-appellate-counsel claim and expanded the list in narrative form to support his request for an evidentiary hearing.  Dkt. 13-7, PC Appeal Brief 1, 14-15, 19.  Even assuming without deciding that Smith requested an evidentiary hearing in accordance with state procedural rules, he did not develop a factual record by submitting any readily available evidence.  For example, he did not submit affidavits from any of the five witnesses he claims trial counsel should have called to testify at trial even though he identified those witnesses at least five months before he filed his postconviction appellate brief requesting an evidentiary hearing from the OCCA.  On this record, the Court cannot find that Smith diligently attempted to develop the factual basis of claim six in state court and, under *Ramirez*, his lack of diligence cannot be excused by any negligence on the part of state postconviction counsel.

As a result, this Court cannot grant Smith's request for an evidentiary hearing unless he makes the showings required under § 2254(e)(2)(A) and (B).  *Ramirez*, 142 S. Ct. at 1734; *Simpson*, 912 F.3d at 576.  This he cannot do.  His claim that appellate counsel was ineffective for failing to argue trial counsel's ineffectiveness does not rely on a new, previously unavailable rule of constitutional law that the Supreme Court has made retroactively applicable, or "a factual predicate that could not have been previously discovered through the exercise of due diligence." § 2254(e)(2)(A).  Each "factual scenario" Smith relies on to argue that appellate counsel should have raised on direct appeal regarding trial counsel's allegedly inadequate investigation either would have been known to Smith before trial (e.g., where he worked, which co-workers saw him leave work on the night of the shooting, and what he wore on the night of the shooting) or during his trial (e.g., whether witnesses to the shooting who knew Smith did not identify him as the shooter, whether "the police reports in discovery indicate time frames of the video of a car that are

inconsistent with the States' theory of guilt, and whether the jury's verdicts were "inconsistent").[13]
Dkt. 8, Pet'r's Br. 37-38.  The Court therefore denies Smith's request for an evidentiary hearing
and will evaluate the merits of claim six on the existing record.

### 4.   Analysis

The Sixth Amendment right to the effective assistance of counsel extends to a criminal
defendant's first appeal as of right.  *See Evitts v. Lucey*, 469 U.S. 387, 396 (1985) ("A first appeal
as of right therefore is not adjudicated in accord with due process of law if the appellant does not
have the effective assistance of an attorney.").  Similarly, *Strickland*'s deferential standard for
evaluating whether counsel provided constitutionally adequate representation extends to a criminal
defendant's claim that appellate counsel was ineffective.  *Smith v. Robbins*, 528 U.S. 259, 285
(2000).  Generally, "[t]o prevail on a claim of ineffective assistance of appellate counsel, a
defendant must establish that counsel was objectively unreasonable in failing to raise or properly
present a claim on direct appeal, and that there is a reasonable probability that, but for this
unreasonable failure, the claim would have resulted in relief on direct appeal."  *Fairchild v.
Trammell*, 784 F.3d 702, 715 (10th Cir. 2015).  "Effective appellate counsel should not raise every
nonfrivolous argument on appeal, but rather only those arguments most likely to succeed."  *Davila
v. Davis*, 137 S. Ct. 2058, 2067 (2017).  Thus, when applying *Strickland* to consider whether
appellate counsel performed deficiently, reviewing courts necessarily must "look to the merits of"
the issue that was either not raised or, in the defendant's view, not adequately presented.  *Miller v.*

---

[13]   Smith identifies Marlon Bruner and DeJuan Patrick as witnesses who saw the shooting,
knew Smith, and did not identify Smith as the shooter.  The state-court record shows that trial
counsel received, in January 2016, discovery documents or recordings of police interviews of both
witnesses.  Dkt. 14-10, O.R. vol. 1, 10.  At that same time, trial counsel received several different
surveillance videos, at least one of which might be "the video of a car" that Smith vaguely refers
to in his brief.  *Id.*

*Mullin*, 354 F.3d 1288, 1298 (10th Cir. 2004) (quoting *Cargle*, 317 F.3d at 1202).  If the underlying substantive issue lacks merit, then a petitioner cannot show that appellate counsel performed deficiently by omitting it.  *Cargle*, 317 F.3d at 1202.

As a reminder, the underlying substantive issue here is also a *Strickland* claim:  Smith's claim that trial counsel performed deficiently and prejudicially by "failing to marshal evidence related to:"

1.   <u>Alibi Witnesses and Evidence</u>:  Smith worked at Blackmon-Mooring on the night of the murder, and his supervisor, Deonta Gaines, signed his time sheet, and his co-workers (Randall and John) would testify as to the time that [Smith] left work which is incompatible with the time of the murder[].

2.   <u>Smith's Work Uniform</u>:  The shooter was described as wearing tan clothing, but Smith's work uniform was a blue shirt and black pants.

3.   <u>Inconsistent Verdicts</u>:  The verdicts were inconsistent because the jury found Smith guilty of murder, but not guilty of counts 2-4 of assault and battery with a deadly weapon.

4.   Witness Marlon Bruner knew Smith and would have identified him as the shooter but did not.

5.   Witness DeJuan Patrick knew Smith and would have identified him as the shooter but did not.

6.   The police reports in discovery indicate time frames of the video of a car that are inconsistent with the State's theory of guilt.

Dkt. 8, Pet'r's Br. 37-38.  For several reasons, Smith's allegations fail to demonstrate that trial counsel was ineffective.

### a.   Failure to call witnesses

Three of Smith's allegations question the reasonableness of trial counsel's alleged failure to call certain witnesses who Smith believes could have offered helpful testimony.  As previously discussed, a court reviewing a claim that trial counsel performed deficiently "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional

assistance." *Strickland*, 466 U.S. at 689.  And a "trial counsel's informed decision not to call a particular witness is a tactical decision and thus a matter of discretion for counsel." *Newmiller v. Raemisch*, 877 F.3d 1178, 1198 (10th Cir. 2017).  As previously noted, *see supra* n.13, the record shows that trial counsel received evidence in discovery, in January 2016, that included what appear to be videotaped police interviews of Marlon Bruner and DeJuan Patrick.  Dkt. 14-10, O.R. vol. 1, 10.  At trial, Detective John Brown, the lead homicide detective for Smith's case, identified Bruner and Patrick as two witnesses to the shooting that he interviewed and testified that Bruner saw two individuals get out of a "dark SUV car" before the shooting.  Dkt. 14-8, Tr. Trial vol. 4, 611 [9], 613 [11], 618 [16], 626 [24].  And trial counsel elicited testimony from Detective Brown during cross-examination that no witnesses he interviewed on the night of the shooting identified the shooter.  *Id.* at 655 [53].  Smith's unsupported assertion that trial counsel did not "marshal evidence" related to these witnesses, in light of evidence that trial counsel received discovery as to statements both made to police after the shooting and elicited testimony from Detective Brown that neither identified the shooter, does not suffice to rebut the presumption that trial counsel made a reasonable, informed decision not to call Bruner and Patrick as witnesses.

In addition, as Crow points out, evidence presented at trial undermines Smith's unsupported assertion that trial counsel unreasonably decided not to call Deonta Gaines, Randall, and John as defense witnesses.  Dkt. 13, Resp. 68.  During the State's direct examination of Detective Brown, Brown testified that he spoke with Gaines and Armando Mendoza at Blackmon Mooring, that he was able to verify that Smith was not at work at 9:00 p.m. on the night of the shooting.  Dkt. 14-8, Tr. Trial vol. 4, 649 [47].  Brown also testified that Smith told Brown during a post-arrest interview, a videotaped interview that was published to the jury, that he arrived home from around 9:30 p.m. on the night of the shooting and that it takes him about 30 minutes to get

home. *Id.* at 646 [44]. Brown testified he drove from Blackmon Mooring to Smith's house in less than 10 minutes. *Id.* at 648 [46], 660 [58]. Smith later admitted to Brown, and Brown had evidence to confirm, that Smith took Colbert to St. John's hospital after the shooting and that Smith was at the hospital around 9:30 p.m. *Id.* at 648 [46], 664 [62]. On cross-examination, trial counsel posed questions to Brown suggesting that Smith may have just generalized the times he left work and arrived home to avoid telling Brown that he took Colbert to the hospital. *Id.* at 662-64 [60-62]. The trial transcript undermines Smith's apparent allegation that trial counsel failed to adequately investigate whether Gaines, Randall, or John might have provided helpful testimony to support Smith's "alibi" or timeline of events on the night of the shooting.

### b.    Remaining allegations

The three remaining allegations are more difficult to decipher. First, Smith alleges trial counsel failed to "marshal evidence" related to the clothing worn by the shooter. Smith alleges, without reference to any portion of the trial record, that "[t]he shooter was described as wearing tan clothing, but Smith's work uniform was a blue shirt and black pants." Dkt. 8, Pet'r's Brief 37. Crow states that he, in an effort to understand this argument, "scoured the trial transcripts and found the only reference to Petitioner wearing tan clothing was made by defense witness Ms. Lacy when she identified Petitioner in the courtroom at trial and said he was wearing a gray shirt with a tie and tan khaki pants." Dkt. 38, Resp. 69 (citing Dkt. 14-8, Tr. Trial vol. 4, 704 [102]. Crow also points out that Smith stated, in the petition-in-error he filed in the OCCA, that trial counsel had possession of Smith's work uniform. *Id.*; *see also* Dkt. 13-7, at 16. It is Smith's burden, not Crow's, to explain how Smith can demonstrate that trial counsel's performance fell below professional norms. And Smith's vague allegation that trial counsel should have done something

more related to his work uniform does not rebut the presumption that trial counsel performed reasonably under the circumstances known to him at the time of trial.

Second, Smith states that the jury verdicts were inconsistent because they convicted him of murder and acquitted him of assault and battery with a deadly weapon. Dkt. 8, Pet'r's Br. 37. It is unclear what Smith alleges trial counsel should have done with the fact that the jury returned what Smith characterizes as inconsistent verdicts. Dkt. 8, Pet'r's Br. 37. Regardless, the trial transcripts show that the jury's verdicts were entirely consistent with the evidence. Smith and Ruff exchanged gunfire in the barbershop, but only Smith was armed with an assault rifle. Dkt. 14-6, Trial vol. 2, 392-96 [135-39]. And the bullet fragment recovered from Liggins's body during his autopsy was consistent with rifle ammunition. Dkt. 14-7, Tr. Trial vol. 3, 469-71 [17-19], 516 [64]. Any rational juror could have easily found that Smith shot and killed Liggins. But the jury's first question to the trial court demonstrates that the jury struggled to find any evidence regarding who shot Harris, Pierce, and Williams. *See* Dkt. 14-10, O.R. vol. 1, 191 ("What is the evidence for which bullets wounded Sheldon, Lawrence, & Randy?"). The jury's verdicts acquitting Smith of three counts of assault and battery with a deadly weapon reflect that the State failed to prove beyond a reasonable doubt that Smith fired the bullets that wounded Harris, Pierce, and Williams. Having heard the evidence presented at trial and having secured acquittals as to three of four charges against Smith, trial counsel could have reasonably determined that there was no basis to challenge the jury's verdicts as inconsistent. Dkt. 14-10, O.R. vol. 1, 191.

Third, and finally, Smith asserts, "The police reports in discovery indicate time frames of the video of a car that are inconsistent with the State's theory of guilt." Dkt. 8, Pet'r's Br. 38. The record shows that trial counsel received several surveillance videos through discovery in January 2016. Dkt. 14-10, O.R. vol. 1, at 126-27. And, though not clear, this could be related to the

conversation between defense counsel and Smith's mother that resulted in Smith's mother being escorted out of the courthouse.   Defense counsel advised the trial court that, during that conversation, he was

> attempting to point out to her difficulties I see with this case, and part of it had to do with, oh, there's some photographs around the 150 mark in the Bates pages, still photos from a surveillance camera on the south side of Latimer east towards Sheridan probably four or five, six houses away from my client's house.  And the discovery clearly indicates that those items are off by about 56 minutes.

> One of the photographs has their Tahoe arriving, and it shows it at 10 o'clock at night.  There's absolutely nothing in the discovery that leads me to believe that that took place at 10 o'clock at night.  It may have taken place at 9:04. That would make more sense given the volume of evidence that we have.  And she was wanting to argue with me that something is not right because it should be 10 o'clock and there's absolutely nothing consistent with that.

Dkt. 14-8, Tr. Trial vol. 4, 680-81 [78-79].

If this is the evidence Smith refers to in his brief, then the record shows defense counsel adequately investigated the evidence received in discovery and used reasonable professional judgment in deciding which evidence to present.  However, without any specific identification of which video or evidence Smith believes trial counsel either was unaware of or failed to develop to Smith's advantage at trial, the Court must presume that trial counsel performed reasonably as to any investigation of evidence that may have been inconsistent with the State's theory of guilt.

### 5.     Conclusion

Based on the foregoing analysis, the Court concludes that Smith has not met his burden to show that trial counsel performed deficiently.  The Court thus finds it unnecessary to consider whether Smith could establish any resulting prejudice.  *See Strickland*, 466 U.S. at 697 (acknowledging that courts need not address both components of the *Strickland* "inquiry if the defendant makes an insufficient showing on one").  Because Smith fails to show that the

allegations of trial counsel's ineffectiveness that appellate counsel did not raise on direct appeal lacked merit, he also fails to show that appellate counsel performed deficiently or prejudicially by omitting these allegations from the claim that was raised on direct appeal.  The Court therefore denies the petition as to claim six.

### G.     Cumulative error (claim seven)

In his seventh and final claim, Smith contends the cumulative effect of errors deprived him of a fair trial.  Dkt. 8, Pet'r's Br. 40-41.  The OCCA rejected Smith's cumulative-error claim on direct appeal, concluding that "[t]here are no errors, considered individually or cumulatively, that merit relief in this case."  Dkt. 8-1, OCCA Op. 11.  Crow contends the OCCA's decision as to this claim is not contrary to, or based on an unreasonable application of, clearly established federal law and is not based on an unreasonable determination of the facts.  Dkt. 13, Resp. 76-77.

"Under cumulative error review, a court 'merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless.'"  *Jackson v. Warrior*, 805 F.3d 940, 955 (10th Cir. 2015) (quoting *Hamilton v. Mullin*, 436 F.3d 1181, 1196 (10th Cir.2006)); *see also Thacker v. Workman*, 678 F.3d 820, 849 (10th Cir. 2012) (noting that "cumulative-error in the federal habeas context applies only where there are two or more actual constitutional errors").  Regardless of whether the Court affords deference to the OCCA's decision or considers this claim de novo, the result is the same.  Smith has not shown that any constitutional errors occurred.  As a result, this Court has no basis to consider cumulative error.  The Court thus denies the petition as to claim seven.

## *CONCLUSION*

The Court concludes that Smith has not established that he is in state custody in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a).  The Court therefore denies his petition for a writ of habeas corpus.  The Court further concludes that reasonable jurists would not debate this Court's assessment of Smith's constitutional claims and therefore declines to issue a certificate of appealability.  *See* 28 U.S.C. § 2253(c)(2) (providing that a district court may issue a certificate of appealability "only if the [petitioner] has made a substantial showing of the denial of a constitutional right"); *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) ("A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.").

**ACCORDINGLY, IT IS HEREBY ORDERED** that:

1. The Clerk of Court shall note on the record the substitution of Scott Crow in place of James Yates as party respondent.

2. Smith's request for an evidentiary hearing is **denied**.

3. The petition for writ of habeas corpus (Dkt. 2) is **denied**.

4. A certificate of appealability is **denied**.

5. A separate judgment shall be entered in this matter.

**DATED** this 2nd day of September, 2022.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE